IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LIEW YOON SAECHAO,

Petitioner, No. 2:09-cv-0007 LKK KJN P

vs.

ROBERT J. HERNANDEZ, Warden,

Respondent. FINDINGS AND RECOMMENDATIONS

_______________________________/

I. Introduction

Petitioner is a state prisoner proceeding without counsel with an application for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his March 22, 2005 conviction of three counts of forcible lewd and lascivious acts on a minor under age 14, and five counts of lewd and lascivious acts on two separate minors under the age of 14. Petitioner was sentenced to a determinate term of twelve years in state prison, plus an indeterminate term of forty-five years to life. Petitioner raises two claims[1] in the instant petition: (1) the trial court abused its discretion by allowing petitioner to be impeached with stale, prior misdemeanor

[1] Petitioner includes two sentences in the sections for grounds three and four of the petition form (dkt. no. 1 at 5); however, petitioner appears therein to only further argue petitioner's first two claims for relief.

conduct, in violation of petitioner's due process rights; and (2) trial counsel was ineffective at sentencing for not successfully arguing that petitioner's sentence violated the Constitution pursuant to Apprendi v. New Jersey, 530 U.S. 466 (2000). After carefully reviewing the record, this court finds that the petition for writ of habeas corpus should be denied.

II. Procedural History

1. A jury convicted petitioner of three counts of forcible lewd and lascivious acts upon his 11-year-old daughter Hi.L. (counts I, II and III); three counts of lewd and lascivious acts upon Hi.L. (counts IV, V and VI), and two counts of lewd and lascivious acts upon his five-year-old daughter, Ha.L. (counts VII and VIII). The jury found that two acts involving Hi.L. had occurred on different occasions than the remaining acts involving Hi.L., and that one count involving Ha.L. had occurred on a different occasion than the other act involving Ha.L. The jury found that petitioner committed lewd acts against two victims under the age of 14, within the meaning of California Penal Code § 667.61, subdivisions (b) and (e)(5).

2. Petitioner was sentenced to state prison for a determinate term of 12 years (the six-year middle term on count VII plus a fully consecutive six-year term on count I), plus an indeterminate term of 45 years to life (three consecutive terms of 15 years to life) on counts II, III and VIII. The court imposed middle terms on counts IV, V, and VI, but ordered the sentences on those counts stayed pursuant to California Penal Code § 654. (2 Clerk's Transcript ("CT") at 324-27.)

3. Petitioner filed a timely appeal in the California Court of Appeal, Third Appellate District. (Lodged Document ("LD") 1.) Petitioner raised only his first evidentiary claim in the direct appeal. (LD 1.) After the appeal was fully briefed, petitioner filed a supplemental opening brief in which he alleged his consecutive and full-term consecutive sentences violated the Sixth and Fourteenth Amendments pursuant to Cunningham v. California, 549 U.S. 270 (2007). (LD 4.) On August 28, 2007, the California Court of Appeal affirmed the judgment. (LD 7.)

4. On October 1, 2007, petitioner filed a petition for review in the California Supreme Court. (LD 8.) On October 31, 2007, the California Supreme Court denied the petition for review without comment. (LD 9.)

5. On January 5, 2009, petitioner filed the instant petition.

III. Facts[2]

*Prosecution case-in-chief*

> [Petitioner] "married" M.S. in 1992 when he was 16 years old and she was 14 years old. They had a "cultural wedding ceremony," which was recognized within their "Mien culture," but they did not have a "legal state marriage." The couple proceeded to have three daughters together: Hi.L., born in November 1992; K.L, born in April 1995; and Ha.L., born in August 1999.
>
> In May 2003, the family relocated from Corning to a two-bedroom apartment in Citrus Heights. The parents and the youngest daughter shared the master bedroom. M.S. worked nights and [petitioner], who was not employed, watched the girls while she was away.
>
> In 2004, the parents' marriage "kind of became distant," which M.S. attributed to [petitioner's] lack of employment. They had previously discussed ending their marriage, which in the Mien culture requires the consent of both sets of parents and other family members. "In a lot of cases," something "bad" or "very terrible" has to happen in order for a marriage to be dissolved.
>
> In May 2004, [petitioner] drove to Redding with the two older daughters to pick up the youngest daughter who had been staying with his parents. The three girls spent the night at their grandparents' home while [petitioner] visited friends. He returned to his parents' home at 5:00 a.m. the next morning and went to bed. That afternoon, [petitioner] and the girls returned home.
>
> Later that day, Ha.L. complained to M.S. "[t]hat her butt hurt."[3] M.S. observed Ha.L. scratching her vaginal area. M.S. undressed Ha.L. and saw a spot of dry blood, about the size of a quarter, on her panties. M.S. asked [petitioner] and the older daughters if they knew of anything happening to Ha.L., but none of them knew.

---

[2] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Saechao, No. C0544 (August 28, 2007), a copy of which was lodged by Respondent as Lodged Document ("LD") 7 on September 28, 2009.

[3] M.S. explained that Ha.L. sometimes used the word "butt" to refer to her vaginal area.

M.S. visually inspected Ha.L.'s vaginal area and saw nothing unusual. She bathed Ha.L. and stored the panties in the pocket of her bathrobe. M.S. telephoned [petitioner's] mother to inquire about the blood and was told that [petitioner] had slept in the same bedroom as his three children.

The next morning, Hi.L. told M.S. she "thought she knew what happened." Hi.L. said that [petitioner] might have done it," because he had also "done it to her." Upon questioning, an apparently scared Hi.L. explained that [petitioner] had put his penis in her; she had seen "[w]hite stuff" come out of his penis; he had done this three times; the first time was in January 2004 and the last was in April 2004; and she had bled the day after the first incident. Hi.L. started to cry as she related this information to her mother.

M.S. was "very shaken" by the information she had been told. The next day, she took Hi.L. and Ha.L. to a Roseville hospital. Citrus Heights Police Officers Barbara West and Carol Mims responded to the hospital's call of suspected child abuse. Mims spoke to Hi.L., who explained what [petitioner] had done to her.

Officer West spoke with Ha.L., who asked whether people go to a hospital "only when they're hurt." Ha.L. told West that her "butt hurt []," because "Dad hurt my butt." She explained that he hurt her "with his hand," and she "mimicked it" by rubbing "her hand up and down the front of her shorts in the pubic area."

The girls were placed in protective custody, and [petitioner] was arrested later that day. M.S. returned to the apartment and gave Ha.L.'s panties to a detective. The detective observed an apparent blood stain about the size of a quarter. The stain tested positive for blood.

Before they were placed in foster care, the girls were examined at the U.C. Davis Child and Adolescent Abuse Resource and Evaluation Center. Cathy Boyle, a pediatric nurse practitioner, conducted a general physical examination and a colposcopic examination of Hi.L. Boyle examined Hi.L.'s private parts and became concerned that she had "possible injuries from a penetrating injury. . . ." Using the colposcope, Boyle observed "areas of narrowing in the posterial [sic] part of her hymenal rim," which Boyle believed could be healed injuries. Boyle also examined Ha.L., but she did not use the colposcope and did not observe any irregularities.

The next day, Hi.L. and Ha.L. gave videotaped interviews at the medical center.

After the girls were returned to M.[S].'s custody, she brought them back to U.C. Davis for further examination by Boyle. In

examining Hi.L., Boyle observed "persistent narrowing" in two locations on her hymen. Boyle believed these could be healed injuries. She opined that child abuse was "highly suspected." After reviewing photographs of the examination with a team of professionals, Boyle concluded that the physical findings "could be consistent with a healed injury."

Boyle reexamined Ha.L., and this time she used the colposcope. She observed several irregularities to Ha.L.'s hymen. If the irregularities resulted from an injury, that injury could have been the source of blood observed on Ha.L.'s panties.

Hi.L., who was 12 years old at the time of trial, described in detail the sexual acts that [petitioner] had committed upon her. Ha.L., who was five years old at the time of trial, testified that [petitioner] had touched her in a way that "wasn't okay."

*Defense*

Dr. James Crawford, a pediatrician and the medical director of the Center for Child Protection at Children's Hospital in Oakland, testified for the defense as an expert in the examination for, and identification of, sexual assault of children. Dr. Crawford reviewed the medical records and photographs from the examination of Hi.L. and Ha.L.

Dr. Crawford deemed the two areas of Hi.L.'s hymen that had concerned Cathy Boyle to be superficial notches, which are seen as often in children who have not been sexually assaulted as in those who have been. Thus, the notches offer no insight into whether the child has been injured in the past.

Dr. Crawford agreed that the area of Ha.L.'s hymen that had concerned Cathy Boyle was a "possible defect," but he could not say for sure whether there was an indentation at that location. Even if there was one, it would not offer insight into whether there had been a prior injury, because indentations in that area of the hymen are frequently found in children who have not been abused.

Dr. Crawford testified that blood on underwear is "not that uncommon" in pediatrics. It may result from several causes unrelated to child abuse.

[Petitioner's] mother testified that, on the days of their visit, he did not sleep with the girls and was never alone with Ha.L.

[Petitioner's] mother advised M.S. that Ha.L. and her cousin P., who lived with the mother at the time of Ha.L.'s visit, would wear each other's clothes. P. was having problems with milk and was experiencing a bit of rectal bleeding.

> [Petitioner] testified that, prior to the present incident, M.S. had attempted on several occasions to take their daughters and leave him. M.S. had expressed that she wanted a divorce, a sentiment that [petitioner] did not share. [Petitioner] explained that a spouse's conviction for molesting his children would assist in obtaining a divorce within the Mien culture.
>
> [Petitioner] testified that, during the time the family lived in Citrus Heights, Hi.L. had not gotten along with him because he has pressured her, as the oldest child, to perform a lot of chores. Hi.L. had lied to her parents "a lot of times," and she tended to hold a grudge.
>
> Regarding the trip to Redding, [petitioner] testified that he did not sleep in the bedroom with the girls.
>
> [Petitioner] testified that the blood-spotted panties belonged to a member of the extended family and did not belong to Ha.L.
>
> Regarding Hi.L.'s knowledge of semen, [petitioner] testified that Hi.L. had previously walked in on him and M.S. while they were engaged in sex and had seen him ejaculate on M.S.'s stomach. On another occasion, Hi.L. had accidentally played a portion of an "R-rated movie" in [petitioner's] DVD player.
>
> [Petitioner's] sister testified that in January or February 2004, Hi.L. had indicated to her that she had seen her parents' video of "naked people and what they do."
>
> Dr. Kevin Coulter, a professor of pediatrics at the University of California Davis Medical Center and the medical director of its Child and Adolescent Abuse Resource and Evaluation Center, testified that a new classification scale for sexual abuse had been instituted in late 2004, subsequent to Boyle's examination of the girls in this case. Dr. Coulter reviewed the photographs from Ha.L.'s examination and concluded, using the new scale, that her examination was normal. Dr. Coulter opined that the photographs of Hi.L. were "not definitive evidence, but supportive of a disclosure" of sexual abuse. He acknowledged that it was "a close call" and that "experts could disagree" regarding that finding.

(LD 7 at 2-8.)

IV. <u>Standards for a Writ of Habeas Corpus</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the

interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (internal citations omitted) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

decision." Harrington v. Richter, 131 S.Ct. 770, 786 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). If there is no reasoned decision, "and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 131 S.Ct. at 784-85 (2011). That presumption may be overcome by a showing that "there is reason to think some other explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal court conducts an independent review of the record. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief. Harrington, 131 S.Ct. at 784. "[A] habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court. Id., 131 S.Ct. at 786.

V. Petitioner's Claims

A. Impeachment with Misdemeanor Convictions

Petitioner claims the trial court abused its discretion by allowing petitioner to be impeached with petitioner's prior misdemeanor convictions, in violation of petitioner's due process rights. Petitioner argues the error was prejudicial because credibility was "the only issue for the jury to decide," (dkt. no. 1 at 11), and the trial court should have found its probative value was outweighed by its prejudicial effect.

The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

*Background*

The trial court heard arguments on whether [petitioner] could be impeached with conduct underlying his two 1995 misdemeanor convictions for second degree burglary. ([Cal. Penal Code] § 459.) Defense counsel argued that, under Evidence Code section 352, the conduct was more prejudicial than probative.[4]

The trial court responded that the convictions are "a little bit old, they are getting out there. [¶] . . . [¶] They are a little over ten years old but I think they're still in the ball park." After the prosecutor argued in favor of admission, the court responded: "Auto theft is classic moral turpitude involving the element of dishonesty. [¶] Now, as I stated, the only thing that makes them a little bit questionable is their age. But the fact there were two incidents rather than one shows a pattern of conduct. And the jury can weigh and consider the age of the convictions and give it less weight if they find the remote nature of the offenses are so far out there they should not attach any importance to them. [¶] But I believe the People are entitled to use them to impeach the [petitioner] given the fact that the People's case is made up of young, vulnerable girls whose credibility is likewise at stake and credibility is central to the jury's ascertainment of truth in this case. [¶] So that being the case, I am finding them more probative than prejudicial. That is given the fact that credibility is key, there are no percipient witnesses to these events other than the [petitioner] and the alleged victims themselves, if . . . the incidents occurred, their credibility is central to the case. So credibility is more at stake than would otherwise be the case."

The trial court inquired whether [petitioner] intended to testify, and defense counsel replied that the decision would be made following presentation of the prosecution case. The court then elaborated on the reasons for its ruling:

"Well, I do find that the events, that is the two offenses, involve the element of dishonesty, they are not remote to the present offense, they are dissimilar to the current charges, all of these criteria under 352 warrant their admission. The [petitioner] has not indicated an intention to testify, so I am treating that

[4] Defense counsel argued that the convictions were not admissible as substantive evidence pursuant to Evidence Code section 1101. The court responded that the prosecutor was seeking to admit the convictions for impeachment rather than as substantive evidence.

criteria as neutral. The two convictions are more probative than a single conviction because they show a pattern of conduct, albeit all in the same year, 1995, but shows purposeful conduct that is more probative than a single incident. Accordingly, both convictions can be used by the prosecution."

[Petitioner] testified on his own behalf and admitted that in 1994 he had pleaded no contest to two misdemeanor counts of auto burglary. On cross-examination, it was clarified that he had suffered the convictions on March 1 and May 17, 1995. [Petitioner] also acknowledged "a couple D.U.I.s back in '97 and '98."

The jury was instructed with CALJIC Nos. 2.20 and 2.23.1 on the proper use of misdemeanor conduct for impeachment.

*Analysis*

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

In exercising its discretion, the trial court considered four factors identified by the California Supreme Court in *People v. Beagle* (1972) 6 Cal.3d 441, 453: (1) whether the prior conviction reflects adversely on an individual's honesty or veracity; (2) the nearness or remoteness in time of a prior conviction; (3) whether the prior conviction is for the same or substantially similar conduct to the charged offense; and (4) what the effect will be if the [petitioner] does not testify out of fear of being prejudiced because of the impeachment by prior convictions. (See *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925.)

[Petitioner] concedes that his prior misdemeanors were burglaries, and burglary is a crime of moral turpitude. (E.g., *People v. Collins* (1986) 42 Cal.3d 378, 395.) Thus, he concedes that the first *Beagle* factor is "not in [his] favor."

Regarding the second *Beagle* factor, [petitioner] concedes there is "no consensus among courts as to how remote a conviction must be before it is too remote." (*People v. Burns* (1987) 189 Cal.App.3d 734, 738.) But even if the convictions were stale, the " 'staleness' of an offense is generally relevant if and only if the [petitioner] has led a blameless life in the interim." (*People v.*

*Harris* (1998) 60 Cal.App.4th 727, 739.) Here, however, [petitioner] incurred two misdemeanor DUI convictions in the years following his burglary convictions. (Cf. *People v. Campbell* (1994) 23 Cal.App .4th 1488, 1496-1497 [defendant with two DUI convictions and unregistered vehicle conviction did not lead legally blameless life] .) [Petitioner] nevertheless claims this factor favors exclusion because he “otherwise has no criminal history of misdemeanors or felonies of any kind.” But to prevail on appeal, [petitioner] must do more than raise a debatable claim of “blamelessness.” Specifically, he must show that the trial court’s implied rejection of this factor was arbitrary, capricious or patently absurd. (*People v. Rodrigues, supra*, 8 Cal.4th at pp. 1124-1125.) He has not done so.

Regarding the third *Beagle* factor, courts have noted that “Prior convictions for the identical offense are not automatically excluded. ‘The identity or similarity of current and impeaching offenses is just one factor to be considered by the trial court in exercising its discretion.’ [Citations.]” (*People v. Mendoza*, *supra,* 78 Cal.App.4th at p. 926.) Thus, under this factor, a lack of similarity weighs in favor of admission of the prior conviction for impeachment.

At the in limine hearing, [petitioner’s] trial counsel argued that the prior convictions were inadmissible as substantive evidence pursuant to Evidence Code section 1101. She emphasized that the prior and present cases do “not involve any conduct that is similar in any stretch of the imagination.” While this fact advanced counsel's Evidence Code section 1101 argument, it did not advance her *Beagle* argument. The trial court correctly reasoned that this factor favored admission of the evidence.

For the first time in his reply brief, [petitioner] contends the third *Beagle* factor should be reinterpreted to exclude prior offenses that are dissimilar to the current offenses. He reasons that, if this is not done, he runs the risk of a jury convicting him “simply because he has committed numerous (but unrelated) crimes in his lifetime, whether or not the prior crimes are similar enough to the current crimes to be probative of an intent or predisposition to commit such crimes.” The contention fails because it is untimely (*People v. Dunn* (1995) 40 Cal.App.4th 1039, 1055), and because it overlooks CALJIC Nos. 2.20 and 2.23.1, which advised the jury on the proper use of misdemeanor conduct for impeachment.

The fourth *Beagle* factor, “what the effect will be if the [petitioner] does not testify out of fear of being prejudiced because of the impeachment by prior convictions, . . . has no application in this case because [petitioner] actually took the stand and suffered impeachment with the priors.” (*People v. Mendoza, supra,* 78 Cal.App.4th at pp. 925-926.)

> In sum, the trial court did not exercise its discretion in an arbitrary, capricious or patently absurd manner. Its ruling did not result in a manifest miscarriage of justice. (*People v. Rodrigues, supra,* 8 Cal.4th at pp. 1124-1125.)

(LD 7 at 9-14.)

A federal habeas court has no authority to review challenges to state court determinations of state law questions. Estelle v. McGuire, 502 U.S. 62, 68 (1991). A state court evidentiary ruling admitting evidence, even if erroneous under state law, is not grounds for federal habeas relief unless the ruling renders the state proceeding so fundamentally unfair as to violate due process. Estelle, 502 U.S. at 67-68; Payne v. Tennessee, 501 U.S. 808, 825 (1991) (if evidence is "so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief"). However, the Supreme Court narrowly defines the category of infractions that violate "fundamental fairness." Estelle, 502 U.S. at 72-73; Dowling v. United States, 493 U.S. 342, 352 (1990). Also, habeas relief for an erroneous evidentiary ruling of constitutional dimension would only be available if the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Ninth Circuit has found that there is no clearly established Supreme Court authority that admission of evidence for purposes of impeachment violates due process. Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).[5] Accordingly, petitioner cannot

---

[5] The Ninth Circuit explained:

> Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable. [Carey v.] Musladin, 549 U.S. [70,] 77 [(2006)].

demonstrate that the state court's denial of this claim was contrary to, or an unreasonable application of, United States Supreme Court authority.

But even if this claim were cognizable under AEDPA, the admission of the prior misdemeanor evidence did not render the trial so fundamentally unfair as to deny petitioner his right to due process. Petitioner has not made any showing that the admission of evidence concerning his prior misdemeanor convictions violated due process or his right to a fair trial. At trial, petitioner admitted that in 1994 he pled no contest to two counts of misdemeanor auto burglary. (3 Reporter's Transcript ("RT") 625.) Petitioner admitted he had a couple of D.U.I.'s in 1997 and 1998. (Id.) On cross-examination, petitioner confirmed he was convicted on March 1, 1995, and May 17, 1995, for the second degree charges. (3 RT 650.) The impeachment testimony was not confusing or inflammatory such that the jury would base its verdict on petitioner's prior conduct. In addition, the impeachment testimony was a small part of the total evidence against petitioner at trial. Each of the victims testified about the acts of molestation committed by the accused upon them. Expert witnesses testified as to the medical evidence.

Moreover, the trial court heard arguments under California Evidence Code § 352, and ultimately admitted the evidence for purposes of impeachment only. The trial court properly instructed the jury that the misdemeanor evidence was to be considered only for purposes of determining the witness' believability. Specifically, the jury was instructed pursuant to CALJIC 2.20, and informed that in determining the believability of a witness, the jury "may consider

---

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," the court cannot conclude that the state court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77.

Holley, 568 F.3d at 1101.

anything that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness, including but not limited to . . . [p]ast criminal conduct of a witness amounting to a misdemeanor." (1 CT 149.) The jury was also instructed pursuant to CALJIC No. 2.23.1:

> Evidence has been introduced for the purpose of showing that a witness engaged in past criminal conduct amounting to a misdemeanor. This evidence may be considered by you only for the purpose of determining the believability of that witness. The fact that the witness engaged in past criminal conduct amounting to a misdemeanor, if it is established, does not necessarily destroy or impair a witness's believability. It is one of the circumstances that you may consider in weighing the testimony of that witness.

(1 CT 151.) It must be presumed that the jurors used the challenged evidence solely for the purpose for which it was admitted, impeachment of petitioner's testimony. See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) ("The court presumes that jurors, conscious of the gravity of their task, attend closely to the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.")

Petitioner placed his credibility at issue by testifying at trial and denying the victim's accusations. Therefore, the prior misdemeanor conduct was relevant as to credibility, and its admission for impeachment purposes did not violate due process. In these circumstances, admission of the prior misdemeanor evidence did not render the trial so fundamentally unfair as to deny petitioner due process. The Court of Appeal did not act contrary to clearly established Supreme Court authority or apply it unreasonably in upholding the admission of the prior misdemeanor evidence for the limited purpose of impeachment. Accordingly, petitioner's first claim for relief should be denied.

B. Alleged Ineffective Assistance of Counsel

Petitioner claims trial counsel was ineffective at sentencing based on counsel's failure to successfully argue the prejudicial effect of the court's reasoning in light of Apprendi, 530 U.S. at 466. As respondent notes, petitioner failed to raise this claim on direct appeal or in the California Supreme Court.

The exhaustion of state court remedies is a prerequisite to the granting of a petition for writ of habeas corpus. 28 U.S.C. § 2254(b)(1). If exhaustion is to be waived, it must be waived explicitly by respondent's counsel. 28 U.S.C. § 2254(b)(3). A waiver of exhaustion, thus, may not be implied or inferred. A petitioner satisfies the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider all claims before presenting them to the federal court. Picard v. Connor, 404 U.S. 270, 276 (1971); Middleton v. Cupp, 768 F.2d 1083, 1086 (9th Cir.), cert. denied, 478 U.S. 1021 (1986).

Because petitioner failed to raise this claim in the California Supreme Court, his second claim is unexhausted, and this court is precluded from granting relief on this claim. However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the application to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland, 466 U.S. at 668. To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Id. at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. Strickland, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

F.3d 972, 981 (9th Cir. 2000).

Petitioner argues that trial counsel was ineffective because the trial judge sentenced petitioner to "both consecutive terms as well as full middle term subordinate terms, rather than one-third middle term subordinate terms" (dkt. No. 1 at 14), and trial counsel failed to successfully argue the prejudicial effect of the court's reasoning (dkt. no. 1 at 25).

As noted above, there is no reasoned rejection of this claim as petitioner failed to raise this claim in state court. However, the California Court of Appeal for the Third Appellate District addressed petitioner's claim that his consecutive sentences violated Apprendi as follows:

> [Petitioner] contends he was sentenced to consecutive subordinate terms and "full" consecutive terms in violation of *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435], *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403], and *Cunningham v. California, supra*, 549 U.S. ____ [166 L.Ed.2d 856]. We disagree.
>
> In *People v. Black* (2007) 41 Cal.4th 799 (*Black II*) the California Supreme Court concluded that a "defendant's constitutional right to jury trial was not violated by the trial court's imposition of consecutive sentences. . . ." (*Id.* at p. 823.) *Black II* explained that "[t]he determination whether two or more sentences should be served in this manner is a 'sentencing decision [ ] made by the judge after the jury has made the factual findings necessary to subject the defendant to the statutory maximum sentence on each offense' and does not 'implicate[ ] the defendant's right to a jury trial on facts that are the functional equivalent of elements of an offense.' [Citation.]" (*Ibid.*) The court's reasoning, involving one-third consecutive terms imposed pursuant to sections 669 and 1170.1, also applies to the fully consecutive terms imposed here in the court's discretion pursuant to sections 667.6, subdivision (c) and 667.61. Accordingly, [petitioner's] contention has no merit.

(LD 7 at 14-15.)

The record reflects the trial court imposed consecutive sentences in an exercise of its discretion, after finding consecutive sentences were not mandatory under California Penal Code § 667.6(d). (4 RT 1040; see also 1 CT 274-76; 4 RT 999-1000.) The trial judge stated:

> In imposing some of the consecutive sentences today the Court finds that in many instances, if not all, the offenses against the victims were planned within the meaning of Rule 421(a)(8) [of the

> California Rules of Court], that [petitioner] breached the trust of children left in his care within the meaning of Rule [421](a)(11), that the [petitioner's] crimes are increasingly serious under Rule 421(b)(2) and, further, that the [petitioner] was on probation from a 2003 misdemeanor D.U.I. when this occurred under [Rule] 421(b)(4). Any one of these would provide justification for me to impose consecutive sentences and, collectively, that is clearly the case.

(4 RT 1038.)

A criminal defendant is entitled to a trial by jury and to have every element necessary to sustain his conviction proven by the state beyond a reasonable doubt. U. S. Const. amends. V, VI, XIV. In Apprendi, 530 U.S. at 490, the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires any fact other than a prior conviction that "increases the penalty for a crime beyond the prescribed statutory maximum" to be "submitted to a jury and proved beyond a reasonable doubt." Id., accord Blakely v. Washington, 542 U.S. 296, 301 (2004); Cunningham, 549 U.S. at 274-75. "[S]tatutory maximum" means "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 542 U.S. at 303. Under California's determinate sentencing law ("DSL"), "[t]he statute defining the offense prescribes three precise terms of imprisonment—a lower, middle, and upper term sentence." Cunningham, 549 U.S. at 277. Because "an upper term sentence may be imposed only when the trial judge finds an aggravating circumstance," the DSL's middle term is "the relevant statutory maximum." Id. at 288.

The Supreme Court has held that the Sixth Amendment, as construed in Apprendi, and Blakely, does not inhibit states from assigning to judges, rather than juries, the findings of facts necessary to the imposition of consecutive, rather than concurrent, sentences for multiple offenses. Oregon v. Ice, 555 U.S. 160 (2009). As petitioner is not constitutionally entitled to have a jury find facts necessary to the imposition of a consecutive sentence, his challenge to the state court's imposition of consecutive sentences does not merit habeas relief. Accordingly, trial

counsel was not ineffective for unsuccessfully arguing against the imposition of consecutive sentences.

Moreover,

> [t]he rule in *Apprendi* only applies where a defendant is sentenced above the statutory maximum sentence for an offense. United States v. Sanchez, 269 F.3d 1250, 1268 (11th Cir. 2001) (en banc). *Apprendi* does not prohibit a sentencing court from imposing consecutive sentences on multiple counts of conviction as long as each is within the applicable statutory maximum.

U.S. v. Davis, 329 F.3d 1250, 1254 (9th Cir. 2003). In this case, none of the sentences imposed on each count individually exceeded the statutory maximum, and there was no violation of Apprendi in the trial court's decision to run the sentences consecutively. Here, jurors found beyond a reasonable doubt that petitioner committed lewd and lascivious acts against two different victims. This was all the jury needed to find to satisfy Apprendi. Id., 530 U.S. at 490.

Finally, the United States Supreme Court has applied Apprendi's rule to facts allowing a sentence exceeding the "standard" range in Washington's sentencing system, Blakely, 542 U.S., at 304-05, and facts prompting an elevated sentence under then-mandatory Federal Sentencing Guidelines, United States v. Booker, 543 U.S. 220, 244 (2005), and to facts permitting imposition of an "upper term" sentence under California's determinate sentencing law, Cunningham, 549 U.S. at 270. All of these decisions involved sentencing for one discrete crime, not, as here, for multiple offenses committed at different times.

For all of the above reasons, petitioner's second claim for relief should be denied.

VI. Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 25, 2011

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

saec0007.157